1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

ECHOSTAR SATELLITE, L.L.C., a
Colorado Limited Liability Company,
et al.,

                                    Plaintiffs,

        vs.

VIEWTECH, INC., a California
Corporation, et al.,

                                    Defendants.

CASE NO. 07-CV-1273 W (AJB)


**ORDER GRANTING IN-PART
AND DENYING IN-PART
MOTION TO DISMISS [DOC.
NO. 15]**

        Plaintiffs EchoStar Satellite, L.L.C., EchoStar Technologies Corporation and
Nagrastar, L.L.C. (collectively, "EchoStar") commenced this action against Defendants
Viewtech, Inc., and Jung Kwak (collectively, "Viewtech"), alleging that Viewtech
unlawfully designed, developed, and distributed devices and other technology intended
to facilitate the illegal and unauthorized reception and decryption of EchoStar's
subscription and pay-per-view television programming.  Viewtech filed this motion to
dismiss EchoStar's complaint on the grounds that it fails to state a claim upon which
relief can be granted.  Fed. R. Civ. P. 12(b)(6).

The Court decides the matter on the papers submitted and without oral argument.  See Civil Local Rule 7.1(d.1).  For the reasons stated below, the Court **GRANTS IN-PART** and **DENIES IN-PART** the motion.

## I.   BACKGROUND

The facts as EchoStar alleges are as follows.  EchoStar provides a variety of video, audio, and data services to consumers throughout the United States via a Direct Broadcast Satellite system.  (Compl., ¶ 2.)  EchoStar operates this broadcast system under the trade name "DISH Network."  (Compl., ¶ 3.)  EchoStar uses satellites to broadcast movies, sports, and entertainment programming to consumers who have been authorized to receive the services for a subscription fee or the purchase price of a pay-per-view movie.  (Compl., ¶ 2.)  To obtain the copyrighted material that EchoStar broadcasts, EchoStar contracts and purchases the distribution rights of copyrighted programming from providers such as network affiliates, pay and specialty broadcasters, cable networks, motion picture distributors, sports leagues, event promoters, and other content providers.  (Compl., ¶ 3.)

In order to prevent the unauthorized reception of DISH Network programming, EchoStar utilizes a management and security system that encrypts (electronically scrambles) EchoStar's satellite signals using proprietary security keys and technology codes.  (Compl., ¶¶ 5-6.)  A customer who wishes to subscribe to the programming must first have the necessary equipment, including (1) a satellite dish antenna; (2) an integrated receiver/decoder; and (3) a credit card sized EchoStar Access Card.  (Compl., ¶ 17.)  The Access Card enables the receiver to process and descramble EchoStar's satellite signals using the data and technology housed within an embedded microprocessor.  (Compl., ¶¶ 6, 18-19.)   Absent a subscription to DISH Network, EchoStar will not provide a consumer an Access Card or authorize access to encrypted DISH Network programming.  (Compl., ¶ 19.)

07cv1273

EchoStar alleges that Viewtech designs, develops, and distributes "Viewsat" branded "free-to-air" receivers ("FTA Receivers") that, when coupled with pirate software, allow consumers to intercept and steal EchoStar's encrypted satellite signal. (Compl., ¶¶ 39-40.)  A satellite dish, mounted on a rooftop or deck railing, receives programming signals from one of EchoStar's satellites. (Compl., ¶ 18.)  The dish then transmits the programming by wire into Viewtech's FTA Receiver.  (Compl., ¶ 18.)  FTA Receivers are devices that can receive "free-to-air" satellite television signals, which are either not scrambled or are scrambled but available free of charge. (Compl., ¶ 28.)  "Free-to-air" channels do not offer the same popular programming such as HBO or ESPN, but instead typically include ethnic, religious, business, music, information, and advertising content. (Compl., ¶ 28.)  Absent an additional technological measure, the FTA Receivers cannot descramble and receive DISH Network programming without utilizing the security keys and technology codes that protect EchoStar's satellite signal. (Compl., ¶ 30.)  EchoStar also alleges that Viewtech designs, develops, and distributes pirate software that allows consumers to intercept and steal EchoStar's encrypted satellite signals.  (Compl., ¶¶ 39-40.)

On July 13, 2007, EchoStar commenced this action against Viewtech, asserting claims based on the Digital Millennium Copyright Act (Count I), the Communications Act of 1934 (Counts II and III), the Electronic Communications Privacy Act (Count IV), California Unfair Competition Law (Count V), and unjust enrichment predicated on Viewtech's garnishment of profits and goodwill from EchoStar (Count VI). Viewtech's motion to dismiss argues that (1) EchoStar lacks standing to pursue a Digital Millennium Copyright Act claim; (2) the Communications Act of 1934 does not govern Viewtech's alleged conduct; (3) EchoStar has failed to allege its basis for a private cause of action under the Electronic Communications Privacy Act; and (4) EchoStar's state law claims are preempted by federal law.

07cv1273

1  II.   LEGAL STANDARD

2      A motion to dismiss under Rule 12(b)(6) tests the complaint's sufficiency.  See

3  North Star Int'l. v. Arizona Corp. Comm'n., 720 F.2d 578, 581 (9th Cir. 1983).

4  Dismissal of a claim according to this rule is proper only in "extraordinary" cases.

5  United States v. Redwood City, 640 F.2d 963, 966 (9th Cir. 1981).  A complaint may

6  be dismissed as a matter of law for two reasons: (1) lack of a cognizable legal theory, or

7  (2) insufficient facts under a cognizable theory.  Robertson v. Dean Witter Reynolds,

8  Inc., 749 F.2d 530, 534 (9th Cir. 1984).

9      As the Supreme Court recently explained, "[w]hile a complaint attacked by a

10  Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's

11  obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels

12  and conclusions, and a formulaic recitation of the elements of a cause of action will not

13  do."  Bell Atlantic Corp. v. Twombly, – – – U.S. – – –, – – –, 127 S.Ct. 1955, 1964

14  (2007).  Rather, the allegations in the complaint "must be enough to raise a right to

15  relief above the speculative level."  Id. at 1964–65.  Additionally, all material allegations

16  in the complaint, "even if doubtful in fact," are assumed to be true.  Id.  The court must

17  assume the truth of all factual allegations and must "construe them in the light most

18  favorable to the nonmoving party."  Gompper v. VISX, Inc., 298 F.3d 893, 895 (9th Cir.

19  2002).  The complaint and all reasonable inferences therefrom are construed in the

20  plaintiff's favor.  Walleri v. Fed. Home Loan Bank of Seattle, 83 F.3d 1575, 1580 (9th

21  Cir. 1996).  Nevertheless, conclusory legal allegations and unwarranted inferences are

22  insufficient to defeat a motion to dismiss.  Ove v. Gwinn, 264 F.3d 817, 821 (9th Cir.

23  2001).

24

25  III.   DISCUSSION

26      A.   Standing under the Digital Millennium Copyright Act.

27      Viewtech argues in its moving papers that EchoStar is not the copyright owner,

28  and thus lacks standing to pursue claims under the Digital Millennium Copyright Act

of 1998 ("DMCA"), 17 U.S.C. §§ 1201(a)(2) and 1201(b)(1). EchoStar counters by arguing that § 1203(a) gives any person who has been injured by a violation of the DMCA standing to sue. 17 U.S.C. § 1203(a). Because EchoStar alleges that it was injured by the interception and theft of its encrypted satellite signals (see Compl., ¶¶ 1-7, 48, 54), EchoStar asserts that it has standing. The Court agrees.

It appears that the Ninth Circuit has not addressed the particular issue of standing under the DMCA. However, several district court cases have dealt with this issue.

In Comcast of Illinois X, L.L.C. v. Hightech Electronics, Inc., No. 03 C 3231, 2004 WL 1718522 (N.D. Ill. July 29, 2004), a cable television provider filed suit under §§ 1201(a)(2) and 1201(b) against defendants involved in distributing devices used to pirate cable channels. Defendants filed a motion to dismiss arguing, among other things, that only copyright holders could pursue claims under the DMCA. Relying on § 1203(a)'s language that "any person injured by a violation of section 1201 or 1202 may bring a civil action," the district court held that standing was not limited to the copyright holder:

> The civil remedies provided in the statute do not explicitly state that recovery is limited to the copyright holder. Therefore, as Comcast controls access to copyrighted material and is a person injured from a violation of 17 U.S.C. § 1201, we conclude that it can bring suit pursuant to the DMCA.

Id. at *6; see also CoxCom, Inc. v. Chaffee, No. CIVA 05-107S, 2006 WL 1793184 at *10 (D.R.I. June 26, 2006) (citing Comcast and holding that "the entity which controls access to the copyright material" could assert a claim under the DMCA); Greenleaf CSC Holdings, Inc. v. Electronics, Inc., No. 99 C 7249, 2000 WL 715601 at *6 (N.D. Ill. June 2, 2000) (holding that a cable provider was authorized to pursue DMCA claims because it was a "person injured by a violation" of the statute); Real Networks, Inc. v. Streambox, Inc., No. 2:99CV02070, 2000 WL 127311 at *6 (W.D. Wash. Jan. 18, 2000) (finding that a non-copyright owner "has standing to pursue DMCA claims under

-5-

07cv1273

1  17 U.S.C. § 1203, which affords standing to 'any person' allegedly injured by a violation
2  of sections 1201 and 1202 of the DMCA").

3       The Court agrees with these cases.  Nothing in the DMCA limits standing to the
4  copyright owner.  Instead, the statute states that "[a]ny person injured by a violation of
5  section 1201 or 1202 may bring a civil action in an appropriate United States district
6  court for such a violation." 17 U.S.C. § 1203(a).  In fact, Viewtech concedes in its reply
7  that standing under the DMCA is not limited to the copyright owner because "[c]ourts
8  have given plaintiffs standing" when, under the authority of the copyright owner, the
9  plaintiffs have "control of the technological measure that protects the copyrighted
10  work."  (Reply at 1:27–2:1.)  Viewtech argues, however, that EchoStar failed to
11  adequately allege that they have the authority of the copyright owner.  The Court
12  disagrees.

13       EchoStar alleges that it contracts and purchases the distribution rights of
14  copyrighted programming from the copyright owners. (Compl., ¶ 3.)  On a motion to
15  dismiss, the complaint and all reasonable inferences therefrom are construed in the
16  plaintiff's favor.  Walleri, 83 F.3d at 1580.  Because EchoStar contracted and purchased
17  the distribution rights of the programming, it is reasonable to infer that EchoStar also
18  has the authority to control the measures protecting the programming.  Therefore,
19  Viewtech's motion to dismiss the DMCA claim is denied.

20  

21      **B.**    **EchoStar's claims under the Communications Act of 1934.**

22       Counts II and III of the Complaint are for violations of §§ 605(a) and 605(e)(4)
23  of the Communications Act of 1934.  Viewtech contends that these claims should be
24  dismissed because "Section 605 is limited in scope and prohibits only the unauthorized
25  'interception' of radio communications offered over a cable system." (P&A at 5:9–10.)
26  EchoStar responds by asserting that § 605 applies because Viewtech is unlawfully
27  intercepting and decrypting EchoStar's *satellite* signals.  For the  reasons addressed
28

below, the Court finds that only § 605(e)(4) applies to Viewtech's conduct, and thus dismisses Count II for violation subsection (a).

The parties' dispute over the applicability of § 605 is primarily centered on the meaning of the term "communication by radio" in subsection (a). This subsection states, in relevant part:

> No person not being entitled thereto shall receive or assist in receiving any interstate or foreign *communication by radio* and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a) (emphasis added). The parties disagree on whether intercepting EchoStar's satellite programming constitutes the interception of a "communication by radio," or the interception of a communication "offered over a cable system" that is covered by a separate section in the Communications Act, 47 U.S.C. § 553.[1]

The Ninth Circuit has not addressed this specific issue, and there is a split among the circuits regarding the scope of § 605. For example, in <u>International Cablevision, Inc. v. Sykes</u>, 75 F.3d 123 (2d Cir. 1996), the Second Circuit held that both § 605 and § 553 apply to claims against sellers of cable television signal descramblers that intercept satellite-borne programming after reaching the cable system's wire-distribution phase. <u>Id.</u> at 133. In so holding, the court adopted the view that the "system of coaxial cable used to facilitate final delivery" of the satellite-borne television programming "does not change the [original] nature of the stolen transmission itself." <u>Id.</u> at 31. In short, under <u>Sykes</u>, once a satellite transmission, always a satellite transmission.

In contrast, in <u>TKR Cable Co. v. Cable City Corp.</u>, 267 F.3d 196 (3rd Cir. 2001), the Third Circuit held that "a cable television descrambler does not facilitate the interception of 'communications by radio' and therefore the statutory damages available under § 605 do not apply here." <u>Id.</u> at 197. Among the reasons cited for disagreeing

---

[1] 47 U.S.C. § 553 provides: "(1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law."

with <u>Sykes</u> was the concern that § 553 would be rendered largely superfluous if § 605 covered satellite-borne transmissions after reaching the wire-distribution system. <u>Id.</u> at 204–205. Accordingly, the Third Circuit concluded that "[o]nce a satellite transmission reaches a cable system's wire distribution phase, it is subject to § 553 and is no longer within the purview of § 605." <u>Id.</u> at 207.[2]

For the reasons stated in <u>TKR</u>, this Court agrees that satellite programming–after reaching the wire distribution phase–no longer fits within the definition of a "communication by radio." But this does not preclude liability under all of § 605.

Section 605(e)(4) provides, in relevant part:

> Any person who manufactures, assembles, . . . sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or *direct-to-home satellite services*, or is intended for any other activity prohibited by subsection (a) of this section, shall be fined not more than $500,000 for each violation. . . .

47 U.S.C. § 605(e)(4) (emphasis added). "Direct-to-home satellite services" is defined as "the distribution or broadcasting of programming or services by satellite *directly to the subscriber's premises* without the use of ground receiving or distribution equipment, except at the subscriber's premises or in the uplink process to the satellite." 47 U.S.C. § 303(v) (emphasis added).

According to the Complaint, EchoStar's programming is sent directly from its satellite to a "satellite dish ... mounted on a rooftop, deck railing, or other structure at the subscriber's home or business." (Compl., ¶18.) Because Viewtech is allegedly manufacturing equipment intended for the unauthorized decryption of programming sent by satellite directly to the subscriber's premises, subsection (e)(4) applies.

_____

[2] EchoStar cites <u>TKR</u> for the proposition that "[t]he wires that connect a home satellite dish to the living room television" fall within the statutory definition of a "communication by radio" because the wires are "facilities... incidental" to the transmission of the satellite programming. (<u>See</u> 47 U.S.C. § 153(33).) In actuality, <u>TKR</u> states, "[t]he wires that connect a home satellite dish to the living room television *arguably* constitute facilities incidental to the transmission." <u>TKR</u>, 267 F.3d at 202 (emphasis added). Clearly, <u>TKR</u> was not deciding the issue, but simply identifying the possibility that such wires might fall within the statutory definition of a "communication by radio."

07cv1273

In contrast to § 605(e)(4), subsection (a) applies only to the interception of "communications by radio" and "satellite cable programming."[3]  See 47 U.S.C. §§ 605(a) and 605(b).  Because there is no reference to "direct-to-home satellite services," the Court finds that subsection (a) does not apply to Viewtech's conduct.  Otherwise, Congress' addition of the term "direct-to-home satellite service" to subsection (e)(4) would be superfluous.

The conclusion that Viewtech's conduct is covered by § 605(e)(4), but not subsection (a), is also supported by the recent Ninth Circuit case, DirecTV, Inc. v. Huynh, 503 F.3d 847 (9th Cir. 2007).  Huynh involved a consolidated appeal from two lawsuits filed by DirecTV, a satellite television programmer, against consumers of pirating technology.  DirecTV claimed the consumers violated § 605(a) and § 605(e)(4).  Defendants in both cases were found liable under subsection (a), but the district courts refused to award damages under subsection (e)(4), and DirecTV appealed.

The Ninth Circuit began its analysis by reviewing the legislative history of § 605.  According to the Ninth Circuit,

> Reading § 605 as a whole makes clear that Congress intended to treat differently individuals who played different roles in the pirating system.  In contrast to subsection (a)'s targeting of individuals who use piracy devices to intercept satellite signals, subsection (e)(4) aims at bigger fish—the assemblers, manufacturers, and distributors of piracy devices.

Huynh, 503 F.3d at 854.  Concerned that DirecTV's attempt to hold consumers liable under both subsections "would destroy the two-tiered approach established by Congress and render subsection (a) redundant," the Ninth Circuit held that subsection (e)(4) did not apply to consumers, and affirmed the district courts.  Id. at 853.

Although Huynh is not directly on point, its reasoning is applicable to this case.  Viewtech is being sued for its role in manufacturing pirating technology.  Because

---

[3]"Satellite cable programming" is defined as programming "transmitted via satellite **and** which is primarily intended **for the direct receipt by cable operators** for their retransmission to cable subscribers."  See 47 U.S.C. § 605(d)(1) (emphasis added).

1    subection (e)(4) is aimed at the manufacturers of the piracy devices, and subsection (a)

2    targets the individual users, Viewtech is only subject to liability under subsection (e)(4).

3        Based on the foregoing, Viewtech's motion is  granted as to Count II (violation

4    of 47 U.S.C. §605(a)) and denied as to Count III (violation of 47 U.S.C. §605(e)(4)).

5

6        **C.    EchoStar's claim under the Electronic Communications Privacy Act.**

7        Viewtech argues that EchoStar has failed to state a claim under the Electronic

8    Communications Privacy Act, 18 U.S.C. § 2511(1)(a) (Count IV in the Complaint).

9    The Court disagrees.

10       Section 2511(1)(a) provides that "any person who... intentionally intercepts,

11   endeavors to intercept, or procures any other person to intercept or endeavor to

12   intercept, any wire, oral, or electronic communication" violates federal law.  18 U.S.C.

13   § 2511(1)(a).  Viewtech contends that this section is only a criminal prohibition and

14   does not provide a private cause of action.  Although Viewtech is correct, 18 U.S.C. §

15   2520 does provide a private cause of action for violation of § 2511(1)(a).

16       Viewtech nevertheless urges the Court to dismiss Count IV because EchoStar did

17   not cite § 2520 in Count IV.  In support of this argument, Viewtech cites In re

18   DirecTV, Inc., No. C-02-5912-JW, 2004 WL 2645971  (N.D. Cal. July 26, 2004).

19   Contrary to Viewtech's argument, that case does not support a dismissal.

20       In In re DirecTV, plaintiff sued defendants for violation of § 2511(1)(a).

21   Although that section does not provide a private cause of action, the court deemed

22   plaintiff's claim as having been filed under § 2520.  In so doing, the court followed other

23   district court cases which found that "because the plaintiff cited § 2520(a) in its prayer

24   for relief, it was sufficiently clear the plaintiff was alleging that the defendant violated

25   § 2511(1)(a) as part of its claim under § 2520(a)."  Id. 2004 WL 2645971 *7, f.n. 6.

26       This Court agrees with the approach taken by In re. DirecTV and the cases cited

27   therein.  Although Count IV identifies § 2511, EchoStar's prayer for relief requests

28   statutory damages "pursuant to 18 U.S.C. § 2520(c)(2)." (Compl., ¶¶ F, G.)  Under the

     federal notice-pleading standard, it is sufficiently clear that EchoStar is pursuing a claim

1    under § 2520.[4]  Thus, the Court deems Count IV as stating a claim under § 2520, and

2    denies Viewtech's motion to dismiss this claim.

3

4    **D.    EchoStar's claims for unfair competition and unjust enrichment.**

5            Viewtech argues that EchoStar's state law claims are preempted by applicable

6    federal law.   More specifically, Viewtech asserts that EchoStar's claims for unfair

7    competition and unjust enrichment "absolutely mirror[] the federal copyright claims"

8    and are "enveloped within the Copyright Act's preemption mandate in § 301 of Title

9    17." (P&A at 8:22, 7:17-18.)  The Court disagrees.

10           The Ninth Circuit has determined that the Copyright Act does not preempt a

11   state law claim unless the following two conditions are satisfied: 1) "the 'subject matter'

12   of the state law claim falls within the subject matter of copyright" and 2) "the rights

13   asserted under state law are equivalent to... the exclusive rights of copyright holders."

14   Laws v. Sony Music Entm't, Inc., 448 F.3d 1134,1137-38 (9th Cir. 2006).  Viewtch's

15   preemption argument fails under the first prong of the analysis.

16            Seemingly, Viewtech argues that the "subject matter" element is met simply

17   because "copyrighted programming" and "copyrighted materials" are mentioned in

18   EchoStar's allegations. (P&A at 8:12, 8:14.)  Although the presence of the copyrighted

19   programming is central to understanding the factual background of this case, EchoStar

20   is not pursuing copyright claims.

21           There are no cases within the Ninth Circuit addressing whether encrypted

22   satellite signals fall within the "subject matter" of copyright law.  EchoStar, however,

23   cites several district court cases from the Fourth and Fifth Circuit holding that satellite

24   signals do not fall within the subject matter of the Copyright Act.

25           In DirecTV, Inc. v. Hoverson, 319 F. Supp. 2d 735 (N.D. Tex. 2004), the

26   Northern District of Texas evaluated whether state claims for the unlawful interception

27   ――――――――――――――

28           [4]Similar to In re DirecTV, Inc., 2004 WL 2645971, in all future filings in this case, EchoStar
     must identify the correct statute.  If EchoStar states a claim under § 2511(1)(a), the claim will be
     dismissed.

07cv1273

of satellite signals were preempted by the Copyright Act.  In recognizing that copyright law protects "works of authorship," the court reasoned that the "mere fact that plaintiff may be communicating content that is copyrightable, and the author of that content may have intellectual property rights under copyright law, is not sufficient to bring a cause of action for interception of communications within the preemption provision of § 301(a)."  Id. at 740; see also In re DirecTV, Inc., No. 2:03CN28BO, 2004 WL 3712007 at *6 (E.D.N.C. Jan. 20, 2004) (holding that a state law claim for conversion of satellite signals was not preempted because "[s]ignals are not subject to copyright protection"); DirecTV, Inc. v. Spillman, No. Civ.A.SA-04-82-XR, 2004 WL 1875045 at *3 (W.D.Tex. Aug. 23, 2004) (finding no preemption because plaintiff's  state law claims were "based on rights to 'broadcast signals,' not any original works....")

The Court agrees with these cases.  Section 102(a) specifically states that it applies to "works of authorship."  Here, however, EchoStar's state claims are concerned about Viewtech's manufacture of equipment that facilitates an unlawful breach of EchoStar's security system.  (Reply at 10:3-4.)  Because these claims do not fall within the "subject matter" of copyright, Viewtech's motion is denied.

## IV.  CONCLUSION AND ORDER

For the reasons discussed above, the Court **GRANTS** Viewtech's motion [Doc. No. 15] with respect to Count II (violation of 47 U.S.C. § 605(a)), but **DENIES** the motion on all other counts.

**IT IS SO ORDERED.**

DATED: February 5, 2008

_____
Hon. Thomas J. Whelan
United States District Judge

-12-

07cv1273

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

07cv1273