1   DAVID R. CLARK, ESQ. (Bar No. 081675)
    drclark@higgslaw.com
2   HIGGS, FLETCHER & MACK LLP
    401 West "A" Street, Suite 2600
3   San Diego, CA 92101-7913
    TEL: 619.236.1551
4   FAX: 619.696.1410

5   MANUEL DE LA CERRA, ESQ. (Bar No. 189313)
    LAW OFFICES OF MANUEL DE LA CERRA
6   6885 Catamaran Drive
    Carlsbad, CA 92011
7   TEL: 760.809.5520
    FAX: 760.269.3542

8
    Attorneys for Defendants and Counterclaimant
9   VIEWTECH, INC.

10                     **UNITED STATES DISTRICT COURT**

11                  **SOUTHERN DISTRICT OF CALIFORNIA**

12
    ECHOSTAR SATELLITE, L.L.C., a          CASE NO. 07 CV 1273 W (AJB)
13  Colorado Limited Liability Company,
    ECHOSTAR TECHNOLOGIES
14  CORPORATION, a Texas Corporation,
    and NAGRASTAR, L.L.C., a Colorado
15  Limited Liability Company,

16                         Plaintiffs,     **COUNTERCLAIM FOR DAMAGES
                                           AND DEMAND FOR JURY TRIAL**
17  v.

18  VIEWTECH, INC., a California
    Corporation, JUNG KWAK, an
19  Individual, and DOES 1 - 10.,

20                        Defendants.

21

22

23

24

25

26

27

28

HIGGS, FLETCHER
& MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

865319.2                                          Case No. 07 CV 1273 W AJB

1  | VIEWTECH, INC., a California
   | Corporation,
2  |
   |                              Counterclaimant,
3  |
   | v.
4  |
   | ECHOSTAR SATELLITE, L.L.C., a
5  | Colorado Limited Liability Company
   | now known as DISH NETWORK, LLC;
6  | ECHOSTAR TECHNOLOGIES
   | CORPORATION, a Texas Corporation
7  | now known as ECHOSTAR
   | TECHNOLOGIES, LLC; and
8  | NAGRASTAR, L.L.C., a Colorado
   | Limited Liability Company,
9  |
   |                              Counterdefendants.
10 |

Before the Honorable
United States District Judge
Thomas J. Whelan

11   Defendant and Counterclaimant, Viewtech, Inc., a California Corporation

12 (hereinafter sometimes referred to as, "Viewtech"), for its Counterclaim and for its claims

13 for relief against Plaintiffs and Counterdefendants, Echostar Satellite, L.L.C., a Colorado

14 Limited Liability Company now known as DISH Network, LLC; Echostar Technologies

15 Corporation, a Texas Corporation now known as Echostar Technologies, LLC; and

16 Nagrastar, L.L.C., a Colorado Limited Liability Company, respectfully states and alleges

17 as follows, and demands a trial by jury on all issues triable to a jury.

18                                         **I.**

19                                     **PARTIES**

20   1.      Defendant and Counterclaimant, Viewtech, Inc., ("Viewtech") is a

21 corporation lawfully formed, organized and in good standing under the laws of the State

22 of California, and having its principal place of business located in Oceanside, California,

23 within this judicial district.

24   2.      Viewtech is informed and believes, and thereon alleges, that

25 Counterdefendant Echostar, LLC, is a limited liability company now known as DISH

26 Network, LLC, and is an indirect wholly-owned subsidiary of DISH Network

27 Corporation, formerly known as Echostar Communications Corporation.

28   3.      Viewtech is also informed and believes, and thereon alleges, that

1   Counterdefendant Echostar Technologies Corporation is a Texas corporation now known

2   as Echostar Technologies, LLC, and is an indirect wholly-owned subsidiary of Echostar

3   Corporation, formerly known as Echostar Holdings Corporation.

4          4.      Viewtech is also informed and believes, and thereon alleges, that

5   Counterdefendant Nagrastar, LLC, is a Colorado limited liability company equally owned

6   by Echostar Corporation and Kudelski, S.A., a Swiss corporation.

7                                              **II.**

8                          **JURISDICTION AND VENUE**

9          5.      This Counterclaim is brought pursuant to 15 U.S.C. §§1, 2, 14 and 15 for

10  violations of the antitrust laws of the United States.  The jurisdiction of this Court is

11  founded on those sections and on 28 U.S.C. §1331, which provides this court with original

12  jurisdiction over actions arising under the laws of the United States, and 28 U.S.C. §1337,

13  which provides this Court with original jurisdiction over any action arising under federal

14  laws regulating commerce or protecting commerce against restraints and monopolies.

15  This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C.

16  §1367.

17         6.      Personal jurisdiction and venue are proper in this Court because Defendant

18  and Counterclaimant, Viewtech, Inc., resides within this judicial district, and Plaintiffs

19  and Counterdefendants are found and have submitted to personal jurisdiction and venue

20  here by filing their Complaint in this judicial district.

21                                             **III.**

22               **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

23         7.      Viewtech realleges and incorporates herein by this reference the allegations

24  in paragraph numbers 1 through 6 of this Counterclaim, as though fully set forth.

25         8.      Viewtech is primarily involved currently in the business of contracting for

26  the manufacture of free-to-air receivers in Korea, importing the receivers into the United

27  States, and then selling the receivers to authorized distributors and dealers of Viewtech

28  products located throughout the United States and Canada.

HIGGS, FLETCHER
& MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

865319.2                                3                    Case No. 07 CV 1273 W AJB

9.     Free-to-air receivers are devices that can receive "free-to-air" satellite television and radio signals, which are not scrambled or encrypted.  Free-to-air channels, as their description suggests, are offered free of charge to those who have appropriate receiver devices to capture and play them.

10.     Along with the advent and improvement of satellite technology and radio and television broadcasting, free-to-air receivers have become increasingly popular with consumers.

11.     Viewtech is informed and believes, and thereon alleges, that there are several dozen free-to-air satellites currently available and in use within the United States, and several dozen more currently available and in use worldwide, all of which broadcast thousands of free-to-air channels, both television and radio.

12.     Viewtech is further informed and believes, and thereon alleges, that free-to-air satellite receivers offer channels and services which are not available on cable or pay for view over-the-air broadcasts, like those offered by Counterdefendants and their other competitors, such as DirecTV, and that free-to-air channels and services often include specialty ethnic, local entertainment, business, information, news and religious programming.

13.     Free-to-air receivers and their associated programming are particularly common in foreign countries, whose residents are often limited to using free-to-air receivers because they cannot afford or do not even have access to pay-for-view cable or over-the-air broadcasts, and they are becoming increasingly popular in the United States among senior citizens, recent immigrants, and other special interest groups for those same reasons.

14.     Free-to-air receivers are also the only commercially available option to specialty consumers who desire to broadcast audio and/or visual performances or events to the general public, particular consumers or member associations.  For example, a symphony in Portland solicited Viewtech recently to purchase its free-to-air receivers in order to broadcast their symphony program to selected orchestra audiences.  In addition,

1   programming such as religious services and ethnic specialty programming serving recent

2   immigrant communities are also uniquely benefited from free-to-air broadcasts because

3   pay-for-view operators do not carry such programming or surreptitiously charge for it.

4        15.    Thus, Viewtech's business nitch serves to support, protect and grow

5   otherwise unserved markets for free-to-air satellite transmission and broadcasting.

6        16.    Indeed, Counterdefendants themselves also promote and sell free-to-air

7   receivers throughout the world and primarily in Europe.  Echostar itself touts that "It has

8   been part of the development of digital television since the beginning and in Europe we've

9   sold millions of receivers for both free-to-air markets and to pay television operators."

10  (See, attached Exhibit "1.")  Echostar currently promotes at least fourteen (14) different

11  models of free-to-air receivers, and for each of these models, Echostar provides that the

12  firmware/software for those free-to-air receivers is available for installation from its

13  website.  (See, attached Exhibit "2.")

14       17.    As Counterdefendants have alleged in their Complaint, hackers have

15  apparently reverse engineered the ECHOSTAR Access Card, and thereby have been able

16  to descramble DISH network programming and receive the programming through "pirate"

17  firmware/software installed in free-to-air receivers, without having to subscribe and pay

18  Counterdefendants for the DISH network channels and shows.

19       18.    Viewtech does not create, construct, manufacture, install, service or support

20  these pirated devices.

21       19.    No Viewtech free-to-air receiver, nor any other Viewtech product, is sold by

22  Viewtech for the purpose of pirating any satellite signal nor with the ability to pirate any

23  satellite signal, including those satellite signals sent by Plaintiffs and Counterdefendants.

24       20.    The factory-installed Viewtech firmware/software in its receivers is

25  designed and manufactured for several legitimate and commercially significant purposes

26  inherent in the operation of all free-to-air receivers, including those made by Plaintiffs and

27  Counterdefendants.  For example, there are occasional "bugs" in Viewtech's receivers

28  which must be remedied, and the original firmware/software can be so corrected directly

HIGGS, FLETCHER
& MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1    from Viewtech's website.  In addition, Viewtech is constantly innovating, and adding

2    improvements and additional features to its firmware/software, which its end users can

3    likewise access and upgrade through Viewtech's website.  These Internet connections are

4    typical and common practices utilized also, as previously stated, by Plaintiffs and

5    Counterdefendants themselves for many of their own free-to-air receivers. (See, attached

6    Exhibit "3.")  Their remaining units can be updated or upgraded "over-the-air" by

7    Echostar since it controls the programming from its own satellite.  Since Viewtech has no

8    satellites, its only Internet option is to service its receivers through its website.

9           21.     Moreover, Viewtech does not promote or condone satellite piracy devices.

10   Viewtech's product warranty is expressly voided if its factory-installed firmware/software

11   is modified or replaced with third-party pirate firmware/software. (See, attached Exhibit

12   "4.")  Viewtech specifically warns its customers that any such product may be seized and

13   used as evidence in a subsequent legal action against the user. (Id.)  Customer service

14   representatives for Viewtech warn consumers that they will not assist in troubleshooting

15   the product if third party pirate firmware/software has been installed. (Id.)  If Viewtech

16   receives one of its units for repair, which has been improperly modified with third party

17   pirate firmware/software, the unit will be flashed and the corrupt third-party pirate

18   firmware/software destroyed.    (Id.)

19          22.     Furthermore, Viewtech continuously publishes routine admonitions on its

20   webpage that Viewtech does not provide or condone the use of third party pirate

21   firmware/software, that Viewtech receivers are designed and intended solely for legal use,

22   and that Viewtech will refuse to sell to anyone whom it believes intends to use the product

23   illegally. (See, attached Exhibit "5.")  Viewtech also admonishes its distributors

24   accordingly, and Viewtech's current agreements with its distributors require that the

25   distributors must not modify, assist in modifying Viewtech products with third party

26   software, or sell the products with third party software in them, and that breach of those

27   agreements may be cause for immediate cancellation by Viewtech of the distributorship.

28   (See, attached Exhibit "6.")

HIGGS, FLETCHER
& MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

865319.2                                      6                      Case No. 07 CV 1273 W AJB

# IV.

## COUNTERDEFENDANTS' WRONGFUL CONDUCT

23. Viewtech realleges and incorporates herein by this reference the allegations in paragraph numbers 1 through 22 of this Counterclaim, as though fully set forth.

24. Viewtech is informed and believes, and thereon alleges, that Counterdefendants are direct horizontal competitors of Viewtech in the same market of manufacturing, distributing, selling and servicing set-top boxes designed to receive satellite programming, and also in the submarket of manufacturing, distributing, selling and servicing free-to-air satellite receivers.

25. Viewtech is also informed and believes, and thereon alleges, that Viewtech and Counterdefendants share a number of common distributors/dealers who sell both Viewtech free-to-air satellite products and Counterdefendants' pay-for-view satellite products.

26. Viewtech is further informed and believes, and thereon alleges, that Counterdefendants have intentionally, maliciously and wrongfully warned their dealer/distributors, including those they share with Viewtech, to **not** sell free-to-air satellite equipment, including Viewtech's receivers, and that they will face disciplinary action if they fail to comply.   (See, attached Exhibit "7.")

27. Moreover, Counterdefendants intentionally, maliciously and wrongfully sent written letters to most of Viewtech's distributors/dealers, including their largest accounts, falsely accusing Viewtech of alleged acts of wrongdoing in connection with the aforementioned pirate third-party software/firmware, disparaging Viewtech and attempting to discourage those distributor/dealers from continuing to do business with Viewtech and discouraging their customers from doing business with Viewtech, and improperly foisting alleged "evidence preservation" obligations on innocent third parties whose documents had not even then been subpoenaed, all for the purpose of dissuading them and their customers from doing business with Viewtech.  (See, attached Exhibit "8.")

1   28.     Counterdefendants have also engaged in anticompetitive conduct in that

2   they have filed suit against thousands of free-to-air receiver competitors, distributors and

3   consumers, making the same false allegations that are made in this case, all in an attempt

4   to force out the free-to-air receiver competition.  Most named defendants in the multitude

5   of cases that Counterdefendants have filed, are small internet business companies or

6   consumers who do not have the financial capability of defending themselves in court.

7   Therefore, Counterdefendants have obtained default judgments on a large percentage of

8   these cases and many of these defendants are no longer in business, even though they sold

9   or used similar, and legal, free-to-air receivers as Counterdefendants sell still today.

10   29.     Furthermore, Counterdefendants have also filed and pursued their

11   Complaint in this case for the improper purpose of attempting to drive Viewtech, and

12   other competitors, out of business, and their baseless and false allegations in that regard

13   fall within the "sham litigation" exemption from Noerr-Pennington immunity.

14   **V.**

15   **FIRST CLAIM FOR RELIEF**

16   **(For Violations of the Clayton Act)**

17   30.     Viewtech realleges and incorporates herein by this reference the allegations

18   in paragraph numbers 1 through 29 of this Counterclaim, as though fully set forth.

19   31.     Viewtech is informed and believes, and thereon alleges, that

20   Counterdefendants have engaged in anticompetitive conduct in violation of the Clayton

21   Act, 15 U.S.C. §§14 and 15, in an illegal effort to lessen competition.  This unlawful

22   conduct  includes, but is not limited to:

23   (i)     sending out written communications to Viewtech's

24   distributors/dealers falsely and maliciously accusing Viewtech of alleged acts of

25   wrongdoing in connection with the pirate third-party software/firmware;

26   (ii)     actively and maliciously attempting to discourage those

27   distributor/dealers from continuing to do business with Viewtech and also discouraging

28   their customers from doing business with Viewtech;

1           (iii)    actively and maliciously attempting to improperly foist alleged

2  "evidence preservation" obligations on innocent third parties whose documents had not

3  even then been subpoenaed;

4           (iv)    threatening and warning certain distributors/dealers not to sell free-

5  to-air satellite equipment, including Viewtech's receivers, thereby causing and

6  constituting an illegal group boycott and refusal to deal; and

7           (v)    filing and pursuing the Complaint in this case, which is objectively

8  baseless in that no reasonable litigant could realistically expect to be successful on the

9  merits, and this lawsuit was filed and pursued to conceal an attempt to interfere with

10  Viewtech's business and to thwart competition in the set-top box business of receiving

11  satellite broadcasting, including free-to-air receivers. Viewtech is further informed and

12  believes, and thereon alleges, that Counterdefendants made fraudulent misrepresentations,

13  false innuendo and speculative assertions in their allegations without adequate information

14  and evidentiary support. Thus, Counterdefendants are not entitled to Noerr-Pennington

15  immunity for this case pursuant to the applicable "sham litigation" exception.

16        32.    Counterdefendants' unlawful conduct has directly and proximately injured

17  Viewtech's business in that its product sales and servicing have significantly fallen,

18  thereby causing substantial financial loss and damage to Viewtech and Viewtech's injury

19  was of the type the antitrust laws were intended to prevent.

20                                 **VI.**

21                    **SECOND CLAIM FOR RELIEF**

22              **(For Violations of the Sherman Act)**

23        33.    Viewtech realleges and incorporates herein by this reference the allegations

24  in paragraph numbers 1 through 32 of this Counterclaim, as though fully set forth.

25        34.    Counterdefendants' conduct of these anticompetitive actions, as above-

26  alleged, also violates the Sherman Act, 15 U.S.C. §1, by illegally restraining trade.

27        35.    Furthermore, Viewtech is also informed and believes, and thereon alleges,

28  that Counterdefendants have unlawfully attempted to monopolize the product market

1  consisting of the sale and servicing of set-top boxes designed to receive satellite

2  programming transmissions, with the specific intent to eliminate Viewtech as a

3  competitor, in violation of the antitrust laws set forth in the Sherman Act, 15 U.S.C. §2.

4         36.    There exists in the United States two primary providers of subscription

5  based satellite services to consumers.  These two providers, Counterdefendants and

6  DirectTV have, for the better part of two decades, created and maintained a highly

7  concentrated market through a series of mergers and acquisitions.

8         37.    The Satcom 1 satellite was built by RCA specifically for use by the primary

9  networks, NBC, CBS, and ABC.  The Satcom 1 began to service cable subscribers and

10  later that year HBO leased a transponder, which required owners of cable systems to

11  spend approximately $10,000 to install 3-meter dishes to receive TV signals in C-band.

12         38.    By 1991 USSB was founded and partnered with DirectTV which by 1994

13  became the first Ku band DBS system.

14         39.    In 1996, Counterdefendant EchoStar incorporated in the State of Nevada.

15  It's Chairman and CEO, Charles Ergan, was also its largest shareholder owning a 49.8%

16  interest through a family trust which translated to a 90.8% voting interest. On or about

17  March 16, 1996 Echostar launched its DISH Network DBS system, which in the

18  subsequent six years grew to approximately 7.5 million subscribers generating revenue in

19  excess of $4 Billion dollars.

20         40.    In the late 1990's two other competitors fell to the market power of

21  Counterdefendants and DirectTV.  AlphaStar, which had launched in 1996 went into

22  bankruptcy in 1997.  Primestar which had launched a DBS system in 1991, was sold in

23  1999.

24         41.    By 2004 Cablevision's Voom service which catered to the emerging HDTV

25  market folded, and in 2005 its HDTV channels migrated to Counterdefendants.  By 2005,

26  Dish's subscriber base had reached nearly 12 million.  In addition, by 2005, Dish and its

27  sole significant competitor, DirectTV, dominated the 27% of U.S. households that

28  subscribed to satellite services, up from 12% in the year 2000.

42.     On or about October 28, 2001, an Agreement and Plan of Merger was submitted to allow Dish/Echostar to acquire its sole significant competitor, Direct TV. Recognizing the significant danger to competition, this proposed acquisition and merger was immediately opposed by the United States Department of Justice and the Attorneys General of twenty-nine states and ultimately thwarted.

43.     Left with such a highly concentrated market in Satellite TV consisting of only two major players, even after Ergan's planned acquisition of Direct TV was unsuccessful, Viewtech is informed and believes, and thereon alleges, that a concerted campaign was launched to drive out other smaller providers of satellite services selling set top boxes to Free To Air (FTA) consumers. While pay-for-view services such as Dish routinely receive FTA programming, largely consisting of foreign language programming designed to benefit large ethnic immigrant communities in the United States, that programming requires consumers to use Counterdefendants' costly access card technology, even though such programming is actually provided free of charge.

44.     Free-to-air only set top boxes such as those manufactured by Viewtech are designed to compete with Counterdefendants and provide this essential free service to needy immigrant communities and other ethnic or special interest groups throughout the country.

45.     Through a significant campaign of voluminous and often sham litigation, Counterdefendants have targeted companies providing such essential FTA services with hundreds of lawsuits speciously alleging tenuous claims that consumers, not the manufacturers of these FTA set top boxes, misappropriated proprietary technology. Viewtech alleges upon information and belief that the majority of these sham lawsuits were resolved not on the merits but by the significant economic disparity between the FTA community and the only two remaining pay satellite services in this highly concentrated market. It is alleged upon information and belief that these lawsuits were initiated solely to drive out of business the small FTA competitors and consumers in order to increase the ever growing pay-for-view services of Counterdefendants.

46.     In addition, Viewtech is further informed and believes, and thereon alleges, that Counterdefendants have initiated a series of vertical restrictions contained in their Dealer Agreements, prohibiting their Dealer network from selling FTA only set top boxes.

47.     Through the series of mergers, attempted mergers, vertical restraints, and vexatious litigation alleged above, a highly concentrated market has developed with only two primary competitors each holding in excess of 40% of the satellite television market, which is sufficient in this case to establish market power.

48.     Furthermore, by February 17, 2009, the Federal Communications Commission and Congress have mandated that all analog channels be converted to digital to allow for broader bandwidth.  According to the FCC, this will allow for clearer picture and sound and will offer programming choices such as multicasting and interactivity. In addition, it will free up analog channels for emergency services such as police and fire.

49.     Further according to the FCC, most if not all televisions which do not currently have digital capabilities will need new equipment.  In most cases this new equipment will need to take the form of set top boxes.  Even existing satellite subscribers will need high definition digital programming, a service overwhelmingly provided exclusively by Counterdefendants. The additional interactivity aspect anticipated by the change will be significantly dominated by Counterdefendants through their recent acquisition of Sling Media, which manufactures the "SlingCatcher" allowing home users to send web and PC based content to their televisions.

50.     As further evidence of Counterdefendants' attempted monopolization in advance of the mandatory transition,  Dish Chairman and CEO Charles Ergan reported at a press conference in Las Vegas at the Consumer Electronics Show in 2007 that Dish would have available the "Echostar TR-40" in June 2008.

51.     The Echostar TR-40 is designed to be purchased with no out of pocket cost to consumers by taking advantage of the National Telecommunications and Information Administration's Digital to Analog Converter Box Coupon Program.

52.     Ergan was also quoted as saying that the TR-40 will be the first digital TV

1   converter that will be effectively free to users and that while Echostar will not directly

2   make money on the device, "its below cost and predatory pricing will increase brand

3   awareness, and hopefully, if users ever decide to get pay TV service they'll keep us in

4   mind."

5        53.    In advance of this federal mandate, it is alleged upon information and belief

6   that a concerted effort to drive out smaller set top box competitors is essential to allow

7   Counterdefendants to ultimately monopolize the satellite television market.

8        54.    A report issued by the National Cable and Telecommunications Association

9   suggests that a digital monitor capable of displaying a high definition signal which uses

10  either the 1080i or 720p format will be needed in conjunction with a separate set top box.

11  All this must be in place by the 17th of February 2009.

12       55.    It is therefore alleged upon information and belief that Counterdefendants

13  are engaged and continue to engage in anticompetitive conduct with the specific intent to

14  eliminate Viewtech as a competitor in the sales and servicing of set top boxes designed to

15  receive programming via satellite downlink in the United States.

16       56.    Such anticompetitive conduct in this highly concentrated market will likely

17  have the effect of driving Viewtech and others out of business with the ultimate effect of

18  obstructing, restraining and excluding competition.  Aside from Counterdefendants'

19  products and services, the loss of Viewtech's free-to-air receiver boxes will leave the

20  market without readily available substitute products in the relevant geographic and

21  product market as alleged above.

22       57.    The market power wielded by Counterdefendants is an attempt to increase

23  market share to control price and price related activities to television consumers in the

24  coming age of the digital television mandate.

25       58.    There exists a dangerous probability that Counterdefendants will succeed in

26  this attempted monopolization by excluding small and often powerless FTA

27  manufacturers and sellers from continuing to service a needed and often-powerless

28  consumer base at low cost.

1   59.   Counterdefendants' unlawful conduct has directly and proximately injured

2   Viewtech's business in that its product sales and servicing have significantly fallen,

3   thereby causing substantial financial loss and damage to Viewtech and Viewtech's injury

4   was of the type the antitrust laws were intended to prevent.

5                                   **VII.**

6                    **THIRD CLAIM FOR RELIEF**

7               **(For Violation of the Cartwright Act)**

8   60.   Viewtech realleges and incorporates herein by this reference the allegations

9   in paragraph numbers 1 through 59 of this Counterclaim, as though fully set forth.

10   61.   As a further direct and proximate result of Counterdefendants' wrongful

11   conduct as above alleged, Counterdefendants have also violated the Cartwright Act,

12   California's state equivalent of the federal Sherman and Clayton Acts, set forth in

13   California Business and Professions Code Section 16600, et. seq., thereby entitling

14   Viewtech to recover its damages, as hereinabove alleged, according to proof at trial.

15                                   **VIII.**

16                   **FOURTH CLAIM FOR RELIEF**

17   **(For Violation of California Business and Professions Code Section 17200)**

18   62.   Viewtech realleges and incorporates herein by this reference the allegations

19   in paragraph numbers 1 through 61 of this Counterclaim, as though fully set forth.

20   63.   As is above alleged, Counterdefendants have engaged and still engage in

21   unfair competition as defined in and prevented by California Business and Professions

22   Code Section 17200.  The foregoing wrongful conduct, as above alleged, amounts to

23   either unlawful, unfair or fraudulent business actions or practices.

24   64.   As a direct and proximate result, Counterdefendants are therefore liable for

25   restitution of all out-of-pocket consideration received from or owed to Viewtech thereby,

26   statutory penalties as applicable, and injunctive relief, for if not restrained,

27   Counterdefendants evidence an intent to continue to perpetrate their unlawful acts and

28   practices constituting unfair competition in California.

HIGGS, FLETCHER
& MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

865319.2                            14                    Case No. 07 CV 1273 W AJB

IX.

**FIFTH CLAIM FOR RELIEF**

**(For Violation of California Business and Professions Code Section 17046)**

65.     Viewtech realleges and incorporates herein by this reference the allegations in paragraph numbers 1 through 64 of this Counterclaim, as though fully set forth.

66.     California has enacted the Unfair Trade Practices Act, which makes it unlawful to threaten, intimidate or boycott any person or entity so as to violate the Act, as is proscribed by California Business and Professions Code Section 17046.

67.     As is above alleged, Counterdefendants have violated California Business and Professions Code Section 17046 thereby entitling Viewtech to recover its damages, as hereinabove alleged, according to proof at trial.

X.

**SIXTH CLAIM FOR RELIEF**

**(For Trade Libel)**

68.     Viewtech realleges and incorporates herein by this reference the allegations in paragraph numbers 1 through 67 of this Counterclaim, as though fully set forth.

69.     As is above alleged, Viewtech was the owner, seller and distributor of its FTA-receiver products, which were made available for sale through its distributors and dealers to the general public.

70.     As is above alleged, Counterdefendants willfully, without justification and without privilege, published and communicated both to Viewtech's distributors and dealers, and the general public, statements disparaging Viewtech and its free-to-air receiver products, and purporting to implicate Viewtech and its free-to-air receiver products in illegal activities.

71.     Such statements made by Counterdefendants were false, and were made by Counterdefendants either with knowledge of their falsity, or with reckless disregard for their truth or falsity.

72.     As a direct and proximate result of Counterdefendants' publications of such

1   statements, prospective dealers, distributors and customers of Viewtech have been

2   deterred from buying Viewtech's free-to-air receiver products, and from otherwise dealing

3   with Viewtech, thereby proximately causing damage and financial loss to Viewtech as

4   will be proved at trial.

5       73.   The foregoing conduct of Counterdefendants was willful and amounts to

6   malice, fraud and/or oppression, and was despicable conduct that subjected Viewtech to a

7   cruel and unjust hardship and conscious disregard of its rights, such that Viewtech, in

8   addition to its actual damages, is entitled to recover an award of exemplary and punitive

9   damages from Counterdefendants, in an amount to be assessed at the time of trial.

10                                  **XI.**

11                  **SEVENTH CLAIM FOR RELIEF**

12   **(For Tortious Interference with Existing Contractual Relations)**

13       74.   Viewtech realleges and incorporates herein by this reference the allegations

14   in paragraph numbers 1 through 74 of this Counterclaim, as though fully set forth.

15       75.   Viewtech had existing contractual relationships with several third-party

16   dealers and distributors containing the probability of profitable economic relationships

17   consisting of continued sales of Viewtech's free-to-air receiver products.

18       76.   Viewtech is informed and believes, and thereon alleges, that

19   Counterdefendants had actual knowledge of those profitable contractual relationships.

20       77.   Viewtech is further informed and believes, and thereon alleges, that

21   Counterdefendants committed the intentional acts as above-alleged, which were designed

22   to disrupt those existing contractual relationships.

23       78.   Those existing contractual relationships were disrupted, in fact, since

24   Viewtech's sales and servicing income from its free-to-air receiver products, has been

25   reduced and harmed.

26       79.   As a direct and proximate result, Viewtech has suffered substantial financial

27   and economic damage in amounts which will be proved at trial.

28

HIGGS, FLETCHER
& MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

865319.2                        16                    Case No. 07 CV 1273 W AJB

1   80.    The foregoing conduct of Counterdefendants was willful and amounts to

2   malice, fraud and/or oppression, and was despicable conduct that subjected Viewtech to a

3   cruel and unjust hardship and conscious disregard of its rights, such that Viewtech, in

4   addition to its actual damages, is entitled to recover an award of exemplary and punitive

5   damages from Counterdefendants, in an amount to be assessed at the time of trial.

6                                          **XII.**

7                          **EIGHTH CLAIM FOR RELIEF**

8          **(For Tortious Interference with Prospective Economic Advantage)**

9   81.    Viewtech realleges and incorporates herein by this reference the allegations

10  in paragraph numbers 1 through 80 of this Counterclaim, as though fully set forth.

11  82.    Viewtech had economic relationships with several third-party dealers and

12  distributors which contained the probability of profitable economic relationships

13  consisting of further sales of Viewtech's free-to-air receiver products.

14  83.    Viewtech is informed and believes, and thereon alleges, that

15  Counterdefendants had actual knowledge of those prospective economic relationships.

16  84.    Viewtech is further informed and believes, and thereon alleges, that

17  Counterdefendants committed intentional acts designed to disrupt those prospective

18  economic relationships, and the actions taken were wrongful by some measure other than

19  the interference with Viewtech's interests, since Counterdefendants breached numerous

20  obligations and violated applicable California and Federal law in many respects as above-

21  alleged.

22  85.    The foregoing prospective economic relationships were disrupted, in fact,

23  since Viewtech would have sold further free-to-air receiver products to these third parties.

24  86.    As a direct and proximate result, Viewtech has suffered substantial financial

25  and economic damage in amounts which will be proved at trial.

26  87.    The foregoing conduct of Counterdefendants was willful and amounts to

27  malice, fraud and/or oppression, and was despicable conduct that subjected Viewtech to a

28  cruel and unjust hardship and conscious disregard of its rights, such that Viewtech, in

1  addition to its actual damages, is entitled to recover an award of exemplary and punitive

2  damages from Counterdefendants, in an amount to be assessed at the time of trial.

3                                              **XIII.**

4                                **PRAYER FOR RELIEF**

5        WHEREFORE, Viewtech demands a trial by jury and requests that judgment be

6  entered against Counterdefendants, and each of them, as follows:

7        1.      As to the first claim for relief, for general and special damages according to

8  proof of trial;

9        2.      As to the second claim for relief, for general and special damages according

10  to proof of trial;

11       3.      As to the third claim for relief, for general and special damages according to

12  proof of trial;

13       4.      As to the fourth claim for relief, for restitution according to proof of trial,

14  for statutory penalties, as applicable, and for injunctive relief to restrain further acts of

15  unfair competition;

16       5.      As to the fifth claim for relief, for general and special damages according to

17  proof of trial;

18       6.      As to the sixth claim for relief, for general and special damages according to

19  proof of trial;

20       7.      As to the seventh claim for relief, for general and special damages according

21  to proof of trial;

22       8.      As to the eighth claim for relief, for general and special damages according

23  to proof of trial;

24       9.      As to the sixth, seventh and eighth claims for relief, for an award of

25  exemplary and punitive damages;

26       10.     As to all appropriate claims for relief, for an award of reasonable attorneys'

27  fees;

28

1    11.   As to all appropriate claims for relief, for pre- and post-judgment interest

2  thereon at the highest available legal rate;

3    12.   For all costs of suit incurred herein; and

4    13.   For such other and further relief as this Court deems just and proper.

5  DATED:  July 7, 2008                    HIGGS, FLETCHER & MACK LLP AND
                                           LAW OFFICES OF MANUEL DE LA
6                                          CERRA

7

8                                          By:    s/David R. Clark
                                               DAVID R. CLARK, ESQ.
9                                              One of the Attorneys for Defendants
                                               and Counterclaimant
10                                             VIEWTECH, INC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HIGGS, FLETCHER
& MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

865319.2                          19                  Case No. 07 CV 1273 W AJB

# EXHIBIT "1"



**PRODUCT INFORMATION**

EchoStar has been part of the development of digital television since the beginning, and in Europe we've sold millions of receivers for both Free to Air markets and to pay television operators. In addition, our middleware is in over 3 million digital terrestrial receivers.

We have extensive experience in tailoring a design to the particular hardware and software needs of any market in the world. Our efficient hardware designs have been created to minimise the overall costs, no matter what business you are in. We have thoroughly tested software middleware stacks for everyone, from the high end user to the entry level customer.

In addition, we've learned a lot along the way about running uplink centres, call centres, and service centres, along with securing bandwidth streams, writing interactive applications and keeping 12 million subscribers happy. You can circumvent the long learning processes required to gain this knowledge by having us consult with you on your projects.

© Copyright 2006 Echostar Europe

# EXHIBIT "2"



## DOWNLOADS
STB Software

| Software | Description |
| --- | --- |
| AD-2000 IP | Free-To-Air Digital Satellite Receiver |
| AD-3000 IP | Analog/Digital with 2 Common Interface Slots and Positioner |
| AD-3000 IP Viaccess© | Analog/Digital with 2 CI Slots, Positioner and embedded Viaccess© |
| AD-3600 IP Viaccess© | Analog - Digital - EchoNAV - 2 Ci - Positioner - Viaccess |
| D-2100 2Ci | Free-To-Air Digital Satellite Receiver |
| D-2400 IP | Digital Satellite Receiver - EchoNAV - 2 Ci - Positioner |
| D-2500 IP | Digital Satellite Receiver with 2 CI Slots and Positioner |
| D-2510 IP | Digital Satellite Receiver with 2 CI Slots and Positioner |
| D-2510 IP Viaccess© | Digital Satellite Receiver with 2 CI Slots, Positioner and embedded Viaccess© |
| D-2600 IP Viaccess© | Digital Satellite Receiver - EchoNav - 2 Ci - Positioner - Viaccess© |
| DSB-1000 2Ci | Free-To-Air Digital Satellite Receiver |
| DSB-1100 | Free-To-Air Digital Satellite Receiver |
| DSB-1100 Viaccess© | Digital Satellite Receiver embedded Viaccess© |
| DSB-1100e | Free-To-Air Digital Satellite Receiver |
| DSB-1220 FTA | Digital Satellite Receiver - EchoLITE - Free-To-Air |
| DSB-1230 FTA | Digital Satellite Receiver - EchoNAV Xpress - FTA |
| DSB-2110 2Ci | Digital Satellite Receiver with 2 CI Slots |
| DSB-2110 2Ci Viaccess© | Digital Satellite Receiver with 2 CI Slots and embedded Viaccess© |
| DSB-2200 2Ci | Digital Satellite Receiver - EchoNAV - 2Ci |
| DSB-2200 2Ci Viaccess© | Digital Satellite Receiver - EchoNAV - 2Ci - Viaccess© |
| DSB-2220 2Ci | Digital Satellite Receiver - EchoLITE - 2Ci |
| DSB-2230 2Ci | Digital Satellite Receiver - EchoNAV Xpress - 2Ci |
| DSB-700 FTA | Free-To-Air Digital Satellite Receiver |
| DSB-707 FTA | Digital Satellite Receiver - EchoNav |
| DSB-707 Viaccess© | Digital Satellite Receiver - EchoNav - Viaccess© |
| DSB-709 FTA | Digital Satellite Receiver - EchoNAV Fixed - Free-To-Air |
| DSB-770 FTA | Digital Satellite Receiver - EchoLITE - Free-To-Air |
| DSB-780 FTA | Digital Satellite Receiver - EchoNAV Xpress - FTA |
| DSB-800 2Ci | Digital Satellite Receiver with 2 Common Interface Slots |
| DSB-808 2Ci | Digital Satellite Receiver - EchoNav - 2Ci |
| DSB-808 2Ci Conax | Digital Satellite Receiver - EchoNAV - 2Ci - Conax |
| DSB-808 2Ci Viaccess© | Digital Satellite Receiver - EchoNav - 2Ci - Viaccess© |
| DSB-880 2Ci | Digital Satellite Receiver - EchoLITE - 2Ci |
| DSB-890 2Ci | Digital Satellite Receiver - EchoNAV Xpress - 2Ci |
| DVR-5000 HDD | Digital Satellite Receiver - EchoNav - HDD - 2 Ci |

| | |
|---|---|
| DVR-5000 HDD Viaccess© | Digital Satellite Receiver - EchoNAV - HDD - 2Ci - Viaccess© |
| DVR-7000 HDD | Analog - Digital - HDD - EchoNav - 2 Ci - Positioner - MP3 |
| DVR-7000 HDD Viaccess© | Analog - Digital - HDD - EchoNav - 2 Ci - Positioner - MP3 - Viaccess© |
| PVR-5020 | Personal Video Recorder - EchoLite PVR - 2Ci - Time-shift - Games - MP3 |
| T-101 FTA | Digital Terrestrial Receiver - Free-To-View (Only available to UK based customers) |
| T-105 | Digital Terrestrial Receiver - Free-To-View - Top Up TV (Only available to UK based customers) |
| T-222 FTA | Digital Terrestrial Receiver - Free-To-Air |
| T-222 FTA Plus | Digital Terrestrial Receiver - EchoLITE - FTA |
| T-232 FTA | Digital Terrestrial Receiver - EchoLITE - FTA |
| T-333 MHP | Digital Terrestrial Receiver - MHP (Only available to Italy based customers) |

© Copyright 2006 Echostar Europe

# EXHIBIT "3"

# USER MANUAL

### Receiver Description

# DSB-1220 FTA
# Digital Satellite Receiver



Printed on recycled paper

Case 3:07-cv-01273-BEN-WVG   Document 37-2   Filed 07/07/08   PageID.248   Page 27 of 56

## 3.    TO INSTALL THE RECEIVER





© 2003 EchoStar International Corporation
All rights reserved

 **WARNING**
ALL EQUIPMENT INVOLVED IN THE INSTALLATION TASK MUST BE INSTALLED CORRECTLY AND
SWITCHED OFF. MAKE SURE THAT IT IS SAFE TO PROCEED WITH THE INSTALLATION TASK.
UNSAFE CIRCUITS AND INSTALLATIONS CAN CAUSE (SERIOUS) INJURY OR DAMAGE TO
EQUIPMENT.

**! CAUTION**
Tighten the F-connectors only by hand. Do not use any tools. You will damage the
connector pins if you overtighten the connector. This will result in loss of signal quality,
or even total loss of reception.

**☞ NOTE**
For receivers that are connected with an UHF cable, make sure that the TV is set to
UHF channel 38 (607.25Mhz). If the channel number on the TV and receiver are not
the same, you will have a distorted or no image at all.
For more information, please refer to the user manual of the TV.

### 3.1.   TO SET UP YOUR RECEIVER FOR THE FIRST TIME

The setup is described in the EchoStar User Interface manual that is also part of the
documentation set.

## 1.   THE RECEIVER

The front panel of the digital satellite receiver gives you the control over the basic functions. The rear panel gives you various connections to connect the audio and video equipment as well as a terrestrial and a dish antenna. Ventilation slots in the housing are provided for cooling of the internal electronics.

The software of the receiver contains the EchoStar user interface with on-screen help, which gives you easy control over the features of the receiver. The software contains also a large database of pre-programmed satellites and transponders which are used for a quick installation. For detailed information, please refer to the EchoStar user manual that is also part of the documentation set.

FEATURE HIGHLIGHTS

- EchoStar Multilingual User Interface;
- 14 day EPG;
- Freeze Picture;
- 7 Timers *(incl. Sleep Timer)*;
- 4,400 Digital Channels, 80 Satellites, 1,500 Transponders;
- Multiple Favorite Channel Lists *(4 for TV, 4 for Radio)*;
- Channel Sorting;
- Multiple Search Modes;
- S/PDIF Audio Output *(Dolby Digital Compatible)*;
- DiSEqC™ 1.2, GoTo X;
- Software Update via Internet/Satellite *(RS-232/OTA)*.



### 1.1.   THE RECEIVER FRONT PANEL



The front panel has:

- The STANDBY indicator to indicate standby.
- The ON indicator to indicate ON.
- The SIGNAL indicator to indicate that you receive a valid signal.
- A display to show the status of the receiver or the TV channel number.
- The ⬤ key, to switch the receiver to Standby or On.
- The arrow up and down keys, to select one channel up or down.

© 2003 EchoStar International Corporation
All rights reserved

# User Guide

## EchoStar Digital Satellite Receiver

with



ECHONAV PRESS User Interface

© 2004 EchoStar International Corporation
All rights reserved

SAFETY GUIDELINES
1  INTENDED USE                                              1-III
2  NOTATIONAL CONVENTIONS                                    1-III
3  GENERAL SAFETY                                            1-III
4  ELECTRICAL SAFETY                                         1-IV
5  ENVIRONMENTAL SAFETY                                      1-IV
6  LOGOS                                                     1-IV
7  CLEANING                                                  1-IV
8  END OF LIFE DISPOSAL                                      1-IV

TABLE OF CONTENTS

QUICK REFERENCE GUIDE
1  REMOTE CONTROL UNIT                                       0-1
2  TO INSTALL THE RECEIVER                                   0-2
3  MENU STRUCTURE                                            0-2
4  OPERATION                                                 0-3

GETTING STARTED
1  UNPACKING                                                 1-1
2  INSTALL YOUR RECEIVER                                     1-1
3  FIRST TIME INSTALLATION                                   1-4

DESCRIPTION AND OPERATION
1  CHANNEL LISTS                                             2-1
2  EPG MENU - PROGRAM INFORMATION                            2-2
3  TELETEXT                                                  2-3
4  TIMERS                                                    2-4
5  ORGANIZE THE LISTS                                        2-5
6  CREATE A FAVORITE LIST                                    2-6
7  LOCK CHANNEL - LIST ACCESS                                2-7
8  EDIT - ADD/EDIT SATELLITE, TRANSPONDER, CHANNEL (PID)     2-8
9  SOFTWARE UPGRADE - FACTORY RESET                          2-9
10 MENU STRUCTURE                                            2-10

TROUBLESHOOTING
1  GENERAL                                                   3-1
2  REMOTE CONTROL UNIT (RCU) RELATED                         3-1
3  LIST RELATED                                              3-1
4  EPG RELATED                                               3-2
5  TIMER RELATED                                             3-2
6  TV AND RADIO RELATED                                      3-3
7  INSTALLATION RELATED                                      3-4
8  MOTORIZED INSTALLATION RELATED                            3-5
9  SMARTCARD RELATED                                         3-5

GLOSSARY
1  ABBREVIATIONS                                             4-1
2  TERMINOLOGY                                               4-1

INDEX

PRE-PROGRAMMED SETTINGS
1  PRE-PROGRAMMED INSTALLATIONS                              A-1
2  PRE-PROGRAMMED LNB(F)                                     A-2
3  USER-PROGRAMMED LNB(F)                                    A-2
4  PRE-PROGRAMMED LIST                                       A-3
5  THE SEARCH MODES                                          A-4

Specifications

Case 3:07-cv-01273-BEN-WVG   Document 37-2   Filed 07/07/08   PageID.252   Page 31 of 56

# Quick Reference Guide

## 2. TO INSTALL THE RECEIVER

⚠ **WARNING**

ALL EQUIPMENT INVOLVED IN THE INSTALLATION TASK MUST BE INSTALLED CORRECTLY AND SWITCHED OFF. MAKE SURE THAT IT IS SAFE TO PROCEED WITH THE INSTALLATION TASK. UNSAFE CIRCUITS AND INSTALLATIONS CAN CAUSE (SERIOUS) INJURY OR DAMAGE TO EQUIPMENT.

For the location and availability of the basic front panel controls, please refer to the front panel as shown on the packaging. If available, the basic front panel controls are:

The standby/on button, to switch the receiver to Standby or On. Note that the ON/OFF switch is located on the rear panel.

The arrow up button, to move one channel up (live only).

The arrow down button, to move one channel down.

**Indicators**

The red indicator shows that there is sufficient signal received

The orange indicator shows that the receiver is in standby

The green indicator shows that the receiver is set to on.

For the location and availability of the connectors, please refer to the rear panel as shown on the packaging. If available, the connectors on the rear panel are:

**LNB IN** (F-type), to connect a dish installation;

**IF OUT** (F-type), for a loop through connection to another receiver/decoder.

**VIDEO** (RCA), to connect to the composite video input of the TV (monitor).

**AUDIO L** (RCA), to connect to the left audio input of a stereo set.

**AUDIO R** (RCA), to connect to the right audio input of a stereo set.

**S/PDIF** (RCA), to connect to a Dolby Digital (AC-3) compatible audio equipment.

**TV** (SCART), to connect to a TV with a fully-featured SCART cable;

**VCR** (SCART), to connect to a VCR with a fully-featured SCART cable.

**SVHS** (DIN), to connect to a S-Video input of SVHS compatible equipment.

**ANT IN** (IEC), to connect to a VHF/UHF terrestrial TV antenna;

**TV OUT** (IEC), to connect to the UHF connector of a TV or a VCR.

**RS-232** (sub-D), to connect to the serial communication port of a PC.

**ON/OFF** switch, to switch the receiver ON or OFF.



(Yellow)

(White)

(Red)

(Black)

ON

OFF

## 3. FIRST TIME INSTALLATION

❗ **CAUTION**

Tighten the cable connectors only by hand. Do not use any tools. You will damage the connector if you over tighten the connector. This will result in loss of signal quality, or even total loss of reception.

1. Make sure, all connections are made safely.

2. Switch the receiver to ON and wait for the Languages menu to appear.

3. For detailed information about the pre-programmed channel lists and installation types, please refer to the appendix.

4. When in the Pre-programmed lists, select a language and the related pre-programmed channel list.

5. Make sure, the pre-programmed language settings are convenient for you.

6. Select Continue and press the OK key.




7. Allow the receiver some time to load the channel list and wait to the live video to appear.

8. If live video does not appear, please refer to the Getting started section for further instructions (DiSEqC1.2, USALS).

© 2004 EchoStar International Corporation
All rights reserved

EchoStar International Corporation

© 2004 EchoStar International Corporation
All rights reserved

## Description and Operation

### 9. SOFTWARE UPGRADE - FACTORY RESET

IF YOU WANT TO DO A SOFTWARE UPGRADE BY OTA:

1. Press the MENU key and select the Installation setup - Software upgrade.
2. Select the applicable OTA setting.
3. Make sure the signal indicator shows a signal.
4. Select Start.
5. Press the OK Key to start the procedure:
   a. the TV screen turns black:
   b. If there is no new EchoNAV version, nothing happens.
   c. If a new EchoNAV version is found on the satellite, the receiver starts to download the new EchoNAV version. This process can take up to approximately 30 minutes.
6. The Software upgrade is completed when the TV shows live video.

IF YOU WANT TO DO A SOFTWARE UPGRADE BY PC:

1. Press the MENU key and select the Installation setup - About EchoStar.
2. Look up the current:
   a. EchoNAV version.
   b. Internet site.
3. On your PC with Internet access, visit our Internet site.
4. Go to the Product support area and find the software for your receiver.
5. Download the latest software as applicable for your receiver.
6. Find the utilities link and download the EchoNAV loader.
7. Follow the instructions as given in the zip-file.
8. Note that on our Internet site, a new manual update is available to cover the latest features.

IF YOU WANT TO DO A FACTORY RESET (required if you want to change the system type, recommended after you cannot resolve any problem):

1. Write down the most important settings before you Confirm the Factory reset (e.g. Switch and Port settings, LNBs, User preferences, etc.)
2. Press the MENU key and select the Installation setup - Factory reset.
3. Select User settings: Yes.
4. Select Confirm.
5. Press the OK Key to start the procedure:
6. Continue with the initial installation to install your receiver.



MENU key - Software upgrade by OTA.



RS-232 cable - Software upgrade by PC.



MENU key - Factory reset.

© 2004 EchoStar International Corporation
All rights reserved

Description and Operation

 Installation setup

 Software upgrade

☞ NOTE

EchoStar offers on a regular basis software updates via the satellite and the EchoStar Internet. If you have trouble to get a download with the latest software version, please ask your retail seller or dealer for assistance.
If you are not able to receive the satellite/transponder, you always can upgrade the software through the RS-232 connector at the rear of the receiver with software from the Internet

1. OTA settings
Factory1 takes a Software upgrade from Hotbird.
Factory2 takes a Software upgrade from Astra1.
User takes a Software upgrade from a user defined SAT
The signal indicator helps you to check the signal quality (top) and strength (bottom) for the defined SAT.

2. SAT
To select the user defined SAT to take a Software upgrade from.

3. Frequency
Shows the Frequency. For OTA setting: User, to select a Frequency.

4. Polarity
Shows the Polarity. For OTA setting: User, to select a Polarity.

5. Symbol rate
Shows the Symbol rate. For OTA setting: User, to select a Symbol rate.

6. FEC
Shows the FEC. For OTA setting: User, to select a FEC.

Start
Starts the Software upgrade. When the TV screen turns black, the receiver first compares the current EchoNAV version with the version on the satellite. If the EchoNAV version is the same, the Software upgrade is aborted and the TV returns to live video.
If a new EchoNAV version is found on the satellite, the receiver starts to download the new EchoNAV version in temporary memory. When the download is complete, the new EchoNAV version is written to the receiver memory where it deletes the previous version. This process can take up to approximately 30 minutes.
The Software upgrade is completed when the TV shows live video.

# EXHIBIT "4"

## Viewtech, Inc. Return Merchandise Authorization Form
### **Viewsat units purchased AFTER May 2007 have a 2 year warranty from the date of purchase**

In order to return defective product for repair or replacement, this form MUST be filled out completely and included with your return. Any product returned without a completed RMA form will be shipped back at the customer's expense.

### PLEASE type or print legibly and Complete RMA form

Date sent: _____ Product Serial # (s) _____

Purchase Date_____ Company Purchased From _____

RMA# _____ (Please call **760-754-9880 Option 4** for RMA #)

Name: _____

Address (**Do not List P.O.Box**):_____

City: _____ State: _____ ZIP Code: _____

Urbanization *(for Puerto Rico Residence)* _____

Phone: _____ Email: _____

PRODUCT :  Xtreme ☐   Ultra ☐   Lite ☐   9000HD ☐   Pro ☐   PVR ☐   Remote Control ☐
### ***DO NOT SEND additional accessories unless approved by technical support***
(If additional accessories are sent without approval, we will not be held responsible for loss or damage)
### PLEASE CHECK IF ADDITIONAL PARTS WERE SENT

Remote ☐   Diseqc switch ☐   RCA Cable ☐   Null modem cable ☐   Manual ☐   HDD cradle ☐
Other☐ (Please Specify) _____

Problem: **Power** ☐   **Signal** ☐   **Video** ☐   **Audio** ☐   **Download** ☐   **MISC** ☐

Describe_____

_____

*Receipt Included? **YES** ☐ **NO** ☐          *Money Order Included? **YES** ☐ **NO** ☐

### IMPORTANT!! >>>>> Terms and Conditions:
### Product must have official Viewsat factory firmware only (No 3rd Party firmware)

- Copy of receipt showing date of purchase and company purchased from must be included with return.
- Proper packaging must be used to prevent further damage to unit.
- If product is damaged due to user error, warranty is void.
- Damage caused by lightning , fire, acts of war, public disturbances, incorrect ventilation or any other cause beyond the control of the distributor are not covered under warranty. Water damaged cannot be repaired.
- Products where label bearing the serial number has been removed, defaced, or is illegible are not covered under warranty.
- Illegal copies, counterfeits, or clones of our product will not be covered under warranty and product may be seized and used as evidence in legal action against seller.
- If Viewtech agrees to repair a unit that is not covered under warranty, there will be a $50 service charge.

## Customer's Signature: _____**By signing, customer agrees to all terms and conditions. If product does not meet warranty requirements, customer agrees to pay $25US to have product shipped back. Additional charge may be added for Intl. shipping.**

**Shipping Address:**
Viewtech, Inc. #446
4140 Oceanside Blvd. #159 Oceanside, CA 92056

# EXHIBIT "5"



Viewsat is the #1
Free-To-Air satellite
receiver in the USA.

To order, please
email: the sales
department or call
us at
**1-888-VIEWSAT
760-754-9880**

**Office Hours**

**Monday-Friday**

**9am-5pm PST**

WAR

ON

CLONES!

**CLICK
HERE!**

**Welcome to the world of FTA.** MPEG-2 is a worldwide satellite transmission standard for digital broadcasting. It is the wave of the future, because of the simple economics that can allow 8 or even 10 video signals to occupy the same space as one channel of analog transmission. Just as some analog signals can be scrambled for subscription use, digital channels can be transmitted either scrambled or in-the-clear. In-The-Clear is known in the digital TV world as FTA or Free-To-Air. There are literally hundreds of Free Channels Available to North Americans for Viewing. National public broadcasters have adopted MPEG-2 as a cost-effective way to distribute their signals on limited budgets.

*Viewsat has been the undisputed #1 selling FTA Receiver and is again excited to introduce yet another amazing receiver. Check out the all new ULTRA LITE! This small but powerful receiver is a must have for any true FTA hobbyist.*





> **Click here for our current complete product line** <

**We at Viewtech Inc.** are looking for qualified dealers for our products. If you would like to become a dealer please go here

Thank you and we look forward to doing business with you in the near future.

## We sell volume only.

## Please see our Dealer section for smaller quantities.

IMPORTANT > We do not provide or condone the use of third party software. Using third party software may be illegal and void

product warranty. Do not email or call asking about DN, DTV, etc. Our satellite receivers are designed and intended for 100% legal use only. We will refuse sale to anyone whom we believe intends to use our product illegally or sell our products for illegal use.

wwww.satelliteguys.com  www.viewsatwholesale.com www.sonicviewsat.com www.trusssatellite.com  www.lyngsat.com www.titantv.com
www.ftaexpress.com www.ftarepublic.com www.viewsatnline.com www.satellite-heaven.de www.westcoastfta.com  ww.ftaexpress.com

Warranty | Liability Agreement

# EXHIBIT "6"

## AUTHORIZED DISTRIBUTOR AGREEMENT

THIS AGREEMENT is between ViewTech with its principal place of business at the 3830 Oceanic Drive - Suite 409; Oceanside, CA 92056 (hereinafter referred to as "VIEWTECH"), and **[INSERT INFO]**  (hereinafter referred to as "DISTRIBUTOR"). VIEWTECH and DISTRIBUTOR are hereinafter referred to jointly as the "Parties" and Individually as "Party".  The effective date of this Agreement is **[INSERT DATE]**.

1. **SCOPE OF APPOINTMENT**
   a. VIEWTECH appoints the DISTRIBUTOR, on a nonexclusive basis, to sell and promote the sale of VIEWTECH products set forth on the current VIEWTECH price pages listed in Exhibit A (hereinafter referred to as "Products") to retail and end users.  This appointment is limited to the Territory specified in section 1(c).
   b. DISTRIBUTOR recognizes that VIEWTECH may sell Products to any customer, including direct sales to dealers or sales to distributors for resale.
   **c. TERRITORY**
      i. VIEWTECH agrees to make Product available to DISTRIBUTOR for resale to retail and other end-users located in **[INSERT GEOGRAPHICAL AREA]** (hereinafter the "Geographical Area").  DISTRIBUTOR agrees not to sell, ship or distribute in any manner, Products to any customer located outside of the Geographical Area.
      ii. DISTRIBUTOR agrees that any resale, shipment or distribution by DISTRIBUTOR or its agents or employees to any customer located outside of the Geographical Area may result in discontinuance of the sale of the Product to DISTRIBUTOR in addition to other remedies available to VIEWTECH.

2. **PARTIES' OBLIGATIONS**
   a. **VIEWTECH'S OBLIGATIONS TO DISTRIBUTOR:** VIEWTECH agrees to:
      i. Use its best efforts to promptly fill DISTRIBUTOR's proper orders for Products.
      ii. Make available the services of a VIEWTECH sales representative to provide Product information, merchandising and general sales support.

   b. **DISTRIBUTOR'S OBLIGATIONS TO VIEWTECH:** DISTRIBUTOR agrees to:
      *i.* Vigorously and enthusiastically promote the sale of the full line of Products and will maintain a well-trained and well-managed sales force capable of and committed to maximizing the demand for Products through every proper means. DISTRIBUTOR promises to

> devote at least the same vigor and resources in promoting Products as it devotes to other suppliers' product lines.

   *ii.* Not misrepresent either directly or by omission the capabilities, qualities, or characteristics of the Products. Neither DISTRIBUTOR nor its representatives will disparage the Products or cast the Production in an unfavorable light.

   iii. ***[OPTIONAL] Purchase a minimum of $50,000.00 of assorted Products, net of discounts and returns, during the term of this Agreement. Every sixty (60) days VIEWTECH and DISTRIBUTOR agree to review DISTRIBUTOR's performance in reaching its minimum purchase requirements and other obligations under this Agreement.***

   iv. Maintain an adequate inventory of the full line of Products so that DISTRIBUTOR can promptly fill orders from stock.

   v. Supply promptly all financial information required by VIEWTECH's Credit Department to assess DISTRIBUTOR's credit worthiness. DISTRIBUTOR will make prompt payment of all VIEWTECH invoices in accordance with current payment terms. DISTRIBUTOR agrees not to make any deductions of any kind from VIEWTECH invoices unless DISTRIBUTOR has received an official credit memorandum from VIEWTECH authorizing such deduction.

   vi. Sell Product under the packaging supplied by VIEWTECH and not make changes to packaging.

**3.  COUNTERFEIT PRODUCTS**

   a. DISTRIBUTOR shall not sell, market, advertise, purchase, support or distribute any product that

     i. bears the VIEWTECH Brand, unless that product was purchased directly from VIEWTECH;

     ii. is a copy/counterfeit of a genuine VIEWTECH Product; or

     iii. might be mistaken for a genuine VIEWTECH Product.

   b. DISTRIBUTOR agrees to promptly report to VIEWTECH all information it has regarding any product that is a copy/counterfeit of a genuine VIEWTECH Product or might be mistaken for a genuine VIEWTECH Product.

   c. DISTRIBUTOR agrees to assist VIEWTECH, at VIEWTECH's expense, in the prosecution of the person(s) responsible for the selling, marketing, advertising and/or supporting of any product that is a copy/counterfeit of a genuine VIEWTECH Product or might be mistaken for a genuine VIEWTECH Product.

**4.  INVENTORY CONTROL**

   a. VIEWTECH shall

     i. provide unique serial numbers on each of its Products; and

Authorized Distributor Agreement     2
Confidential – Do Not Disclose

      ii.  cross-reference those serials numbers to the DISTRIBUTOR's purchase order; and

     iii.  maintain a database storing the cross-referenced serial numbers to the DISTRIBUTOR's purchase order.

  b.  DISTRIBUTOR shall

      i.  cross-reference the unique serial number to any purchase order received from a retail, end-user or other customer, provide the purchase order is for more than 25 units of Product;

      ii.  maintain a database storing the cross-referenced serial numbers to the retail, end-user or other customer's purchase orders; and

     iii.  make available to VIEWTECH the database upon fifteen (15) days written notice.

5.   **MODIFICATION OF PRODUCT**

  a.  DISTRIBUTOR shall not modify or assist others to modify the Products with third party software, or sell Products modified with third party software. This software may be illegal under, *inter alia*, the Digital Millennium Copyright Act of 1998 (17 USC Sec.1201). VIEWTECH does not sanction the use of third party software and its use by DISTRIBUTOR will void any applicable Product warranty, and may be cause for immediate cancellation by VIEWTECH of this Agreement.

  b.  DISTRIBUTOR agrees to indemnify and hold harmless VIEWTECH, its officers, directors, shareholders, employees, agents, assigns, and affiliates, from any and all claims, actions, suits, and demands (including all associated costs), brought against VIEWTECH in connection with any improper use of products purchased by DISTRIBUTOR from VIEWTECH. This indemnification includes, but is not limited to, products purchased by DISTRIBUTOR and resold to other distributors, retailers and end users.

  c.  DISTRIBUTOR agrees to place the following disclaimer prominently on any of its websites advertising VIEWTECH Products and, to the extent possible, on all its other publications advertising VIEWTECH Products:

> **WARNING:** The Products sold by DISTRIBUTOR are intended for legitimate use only. DISTRIBUTOR's free-to-air Products are factory loaded by VIEWTECH INC. with software that legally allows you to receive only unencrypted free-to-air channels. Neither DISTRIBUTOR nor VIEWTECH INC. loads its Products, nor supports or condones the loading of its Products, with any third-party software that modifies the Products to receive encrypted channels. ***It is a crime to illegally access encrypted satellite signals.*** By placing an order with DISTRIBUTOR, the purchaser agrees that the Products ordered will only be used lawfully. The purchaser also agrees to indemnify and hold harmless DISTRIBUTOR, its officers, directors, shareholders, employees, agents, and affiliates, from all claims, actions, suits, and demands (including all associated costs), brought against

DISTRIBUTOR for the improper use of VIEWTECH Products purchased from DISTRIBUTOR. DISTRIBUTOR and VIEWTECH INC. will only support Products containing their original factory loaded software. Any modification, including loading of the third party software, will void the Product's warranty. DISTRIBUTOR will refuse sale to anyone whom it believes intends to use its products illegally or sell its products for illegal use.

6.   **PRICES AND TERMS AND CONDITIONS OF SALE**
   a.   **PRICES.** The price of Products and other terms and conditions of sale (including payment terms, F.O.B. point, minimum order requirements) are as stated in Exhibit A.
   b.   **PRICE CHANGES.** Prices may be increased and other terms and conditions of sale may be changed by VIEWTECH at any time with thirty (30) days prior written notice to DISTRIBUTOR, but the change will not affect any order properly placed with VIEWTECH and ready for immediate shipment before the effective date of the change.
   c.   **TAXES.** Prices listed on VIEWTECH's price pages do not include sales, use, excise, or similar taxes. The amount of any present, retroactive, or future sales, use, excise or similar tax applicable to DISTRIBUTOR's purchase of Products shall be added to the VIEWTECH invoice and paid by DISTRIBUTOR unless DISTRIBUTOR provides VIEWTECH with tax exemption certificates acceptable to the appropriate taxing authorities.
   d.   **PURCHASE ORDERS.** Products may be ordered pursuant to purchase orders submitted to VIEWTECH by DISTRIBUTOR. Acceptance of any purchase orders placed by DISTRIBUTOR, either by written acknowledgement or by shipment of Products, shall NOT constitute acceptance by VIEWTECH of any of the terms and conditions of such purchase orders except as to identification and quantity of the Products involved. All such purchase orders shall be governed by the provisions of this Agreement.

7.   **INTELLECTUAL PROPERTY AND CONFIDENTIAL/ PROPRIETARY INFORMATION:**
   a.   DISTRIBUTOR agrees that VIEWTECH own the following valid trademarks: "ViewTech," "ViewSat" and "ViewSat Lite."
   b.   DISTRIBUTOR shall not use VIEWTECH's trademarks without the prior, express written consent of VIEWTECH. Under no circumstances shall DISTRIBUTOR, at any time, use VIEWTECH's trademarks or other proprietary information as part of DISTRIBUTOR'S corporate or trade name. Upon termination of this Agreement, DISTRIBUTOR shall remove all references to VIEWTECH (or VIEWTECH's intellectual property, including trademarks) from its letterheads, advertising literature and places of business, and shall not thereafter use any similar or deceptive

name or trademark intending to give the impression that there is any relationship between the Parties.

c. All information transferred or otherwise revealed to DISTRIBUTOR by VIEWTECH under this Agreement, including but not limited to, engineering information, manufacturing information, technology, know-how, marketing plans, promotional programs, pricing information, customer lists, distributor lists and any other VIEWTECH confidential/proprietary information will at all times remain VIEWTECH's property. DISTRIBUTOR shall at all times hold such information confidential and shall not disclose any such information if not otherwise within the public domain. Upon any termination of this Agreement, or as VIEWTECH directs from time to time, DISTRIBUTOR shall promptly return all such information to VIEWTECH, together with any copies or reproductions thereof. DISTRIBUTOR'S obligations under this section shall survive any termination of the Agreement.

8.  **WARRANTY AND FORCE MAJEURE**

a. VIEWTECH warrants that all Products delivered hereunder shall be of VIEWTECH's standard quality. VIEWTECH MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED: THERE ARE NO IMPLIED WARRANTIES INCLUDING WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

b. VIEWTECH shall not be liable for damages resulting from delays in shipment or inability to ship due to normal production and shipment delays or those resulting from acts of God, fires, floods, wars, sabotage, accidents, labor disputes or shortages, plant shutdown or equipment failure, voluntary or involuntary compliances with any law, order, rule or regulation of governmental agency or authority; or inability to obtain material (including power and fuel), equipment or transportation, or arising from any other contingency, circumstances or event beyond the control of the VIEWTECH.

9.  TERM OF AGREEMENT: *[This Agreement shall remain in effect for the period commencing on the date first written above and expiring two years therefrom. [OPTIONAL, DEPENDING ON SECTION 8(a) below]*

10. **EVENTS OF TERMINATION**

a. *[This Agreement shall remain in effect for the period commencing on the date first written above and expiring December 31 of the same year. This Agreement shall automatically be extended for additional, consecutive terms of one year.] [OPTIONAL, DEPENDING ON SECTION 7 ABOVE]* This Agreement may be terminated as follows:

   i. By DISTRIBUTOR or VIEWTECH for any reason upon one-hundred and eighty (180) days prior written notice;

   ii. by mutual consent in writing at any time; or

Authorized Distributor Agreement                    5
Confidential – Do Not Disclose

      iii.  by either Party immediately upon the giving of notice that the other party is in breach of any of its material obligations under this Agreement.

    b.  All orders from DISTRIBUTOR not shipped on the date that notice of termination of this Agreement is delivered or on the date that this Agreement otherwise terminates may be deemed canceled at VIEWTECH' discretion. Upon termination of this Agreement, DISTRIBUTOR shall cease all conduct, which might cause anyone to believe that DISTRIBUTOR is a distributor of Products or otherwise connected with VIEWTECH

    c.  DISTRIBUTOR acknowledges and agrees that VIEWTECH shall be under no obligation to renew or extend this agreement.

**11.    GENERAL TERMS:**

    a.  **NOTICES:** All notices and other communications required or permitted hereunder shall be in writing and shall be sent to the following:

| To VIEWTECH: | To DISTRIBUTOR: |
|---|---|
| Rob Rhine<br>President<br>ViewTech, Inc.<br>3830 Oceanic Drive - Suite 409<br>Oceanside, CA 92056 | [INSERT INFO] |

    b.  **RELATIONSHIP OF THE PARTIES.** The relationship established between VIEWTECH and DISTRIBUTOR by this Agreement is that of a vendor to its vendee. DISTRIBUTOR is not an agent of VIEWTECH and has no authority to bind VIEWTECH, transact any business in VIEWTECH's name or on its behalf in any manner, or make any promises or representations on behalf of VIEWTECH. DISTRIBUTOR agrees to represent itself only as an independent business who is an "authorized VIEWTECH DISTRIBUTOR." The employees and agents of DISTRIBUTOR are NOT for any purpose the employee or agents of VIEWTECH.

    c.  **NO ASSIGNMENT.** DISTRIBUTOR shall not assign its rights or delegate its duties under this Agreement without VIEWTECH's prior written notice.

    d.  **NO WAIVER.** Any failure or delay by either Party in exercising any right or remedy in one or many instances will not prohibit a Party from exercising it at a later time or from exercising any other right or remedy.

    e.  **ENTIRE AGREEMENT.** This Agreement and the Exhibits referred to in this Agreement, which Exhibits are incorporated herein and made a party hereof by this reference, supersede and terminate any and all prior

agreements, if any, whether written or oral, between the Parties with respect to the subject matter contained herein. Each Party agrees that it has not relied on any representation, warranty, or provision not explicitly stated in this Agreement and that no oral statement has been made to either Party that in any way tends to waive any of the terms or conditions of this Agreement. This Agreement constitutes the final written expression of all terms of the Agreement, and it is a complete and exclusive statement of those terms. No part of this Agreement may be waived, modified, or supplemented in any manner whatsoever (including a course of dealing or of performance or usage of trade) except by a written instrument signed by duly authorized officers of the Parties.

f.  **NON-COMPETE**. DISTRIBUTOR agrees to not sell merchandise similar to the Products listed on Exhibit A for a period of 5 years after the dissolution of this Agreement.

g.  **INDEMNIFICATION**. DISTRIBUTOR agrees to indemnify and hold the VIEWTECH harmless from any claims and expenses whatsoever (including attorney's fees) arising from the breach by DISTRIBUTOR of any of the terms of this Agreement, or any other contracts or agreements entered into by DISTRIBUTOR.

h.  **CONFIDENTIALITY OF THIS AGREEMENT**:  This Agreement, the exhibits hereto, and the terms contained therein are confidential and shall not be disclosed by either party.

i.  **GOVERNING LAW AND VENUE**. The effect and interpretation of this Agreement shall be governed by the laws of the State of California. The Parties agree that any legal proceedings involving this Agreement shall be commenced in San Diego, County, California. The Parties agree to be subject to the jurisdiction of the courts (either state or federal) of San Diego, County, California for purposes of any legal proceedings.

j.  **ATTORNEY'S FEES AND COSTS IN ACTION ON AGREEMENT**. The prevailing party in any action or proceeding to enforce any provision of this agreement will be awarded reasonable attorney's fees and costs incurred in that action or proceeding or in efforts to negotiate the matter.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

| VIEWTECH: | DISTRIBUTOR |
|---|---|
|  |  |

| Rob Rhine<br>President<br>ViewTech, Inc.<br>3830 Oceanic Drive - Suite 409<br>Oceanside,  CA 92056 | **[INSERT INFO]** |
|---|---|

# EXHIBIT "7"





## FREE-TO-AIR (FTA) RECEIVER PIRACY

- Our industry has a Free-To-Air Receiver ("FTA") piracy problem.

- Piracy hurts all of us.

- We have sued the largest FTA distributors in the U.S. because they are encouraging and facilitating the FTA piracy problem.

- EchoStar is requiring that any Retailer selling any FTA receivers stop such practices within 30-days.

- Failure to comply will lead to disciplinary action.

SatelliteGuys.US

retail services

# EXHIBIT "8"

# T. WADE WELCH & ASSOCIATES

ATTORNEYS AT LAW
SEVENTH FLOOR
2401 FOUNTAINVIEW, SUITE 700
HOUSTON, TEXAS 77057
(713) 952-4334
FAX (713) 952-4994
www.twwlaw.com

RICHARD R. OLSEN

July 23, 2007

## VIA CERTIFIED U.S. MAIL

South Coast FTA
a/k/a southcoastfta.com
4364 Bonita Road, Suite 196
Bonita, CA 91902

> Re:  *EchoStar Satellite L.L.C. et al. v. Viewtech, Inc. et al.*, filed in the United States
> District Court for the Southern District of California.

Dear Sirs:

Please be advised that EchoStar Satellite L.L.C., EchoStar Technologies Corporation, and NagraStar L.L.C. (collectively "Plaintiffs") have filed suit against Viewtech, Inc., Jung Kwak, and several unidentified parties (collectively "Defendants") in the United States District Court for the Southern District of California. The lawsuit alleges that Defendants directly, or through others acting in concert, violated federal and state law by offering, providing, or otherwise engaging in the traffic of devices and technology that are primarily designed to facilitate the unauthorized reception of Plaintiffs' encrypted satellite signals.

This letter is to notify you that Plaintiffs have reason to believe that critical evidence in this matter, including but not limited to, documents, electronically stored information, and tangible things, may be in the possession, custody, or control of South Coast FTA a/k/a/ southcoastfta.com ("South Coast"). Therefore, Plaintiffs hereby give notice and demand that such evidence be immediately preserved and retained by South Coast. Unless otherwise instructed, all information identified in this letter should be preserved from the period January 2004 through the present date.

## PRESERVATION OBLIGATIONS

All documents, electronically stored information, and/or tangible things pertaining to the design, development, manufacture, assembly, modification, solicitation, or distribution of "Viewsat" branded equipment and/or software are an important and irreplaceable source of discovery and evidence in the aforementioned litigation. Therefore, South Coast must preserve any such documents, electronic information, or tangible things stored in computer systems, removable electronic media, offices, warehouses, or any other location within the possession, custody, or

T. WADE WELCH & ASSOCIATES

control of South Coast. Likewise, you must take affirmative steps to ensure that such evidence is safeguarded and preserved until the resolution of this legal matter. Accordingly, South Coast should implement preservation measures, including but not limited to the following:

- Discontinue all document and data destruction (including backup tape policies);
- Preserve and not dispose of relevant hardware unless an exact replica of the file (a mirror image) is made;
- Preserve and not destroy passwords, decryption procedures (and accompanying software), network access codes, ID names, manuals, tutorials, written instructions, decompression, or construction software;
- Maintain all pertinent information and tools needed to access, review, and reconstruct necessary access to all relevant documents, electronically stored information, and tangible things; and
- Prevent anyone with access to your documents, data, systems, or archives from modifying, destroying, or otherwise corrupting such evidence.

## DESCRIPTION OF EVIDENCE THAT SHOULD BE PRESERVED

### I.    Documents

South Coast is obligated to preserve and retain all documents pertaining to the design, development, manufacture, assembly, modification, solicitation, or distribution of "Viewsat" branded equipment and/or any software technology designed or developed for download on such devices. For the purpose of this letter, the term "document" shall include, but is not limited to, the original (or copy if original is unavailable) of any printed, typewritten, handwritten, tangible, photocopied, or otherwise reproduced item relating to the information requested herein.

South Coast should preserve, without limitation, any of the following documents that relate to the described allegations against Defendants:

- printed e-mails or other printed electronic communications;
- letters, memoranda, messages, handwritten notes;
- computer diskettes, CDs;
- agreements, contracts, stock certificates, promissory notes;
- appraisals and valuation estimates of any kind;
- financial data, books of account, accounting ledgers, journals;
- tax returns and records;
- financial statements, cash flow records, financial projections;
- operating statements, balance sheets, accounts payable and receivable;
- bank records, checks (including canceled checks);
- invoices, sales receipts, charge receipts, expense records, personal receipts;
- diaries, calendars, logs;

2

### T. WADE WELCH & ASSOCIATES

- court filings (including any transcripts of interviews or testimony given before any person, officer, or tribunal and any written summaries, reports, or statements thereof);
- notes of conversations, meetings, investigations, opinions, interviews, and/or testimony;
- books, pamphlets, brochures, catalogs, price lists;
- charts, graphs, diagrams, maps;
- telephone records, telefax or facsimile copies;
- computer printouts, data card programs or other input or output of data processing systems;
- photographs (positive print or negative), film, microfilm or microfiche;
- codebooks, keys, data dictionaries.

## II.    Electronically Stored Information

South Coast is obligated to preserve all electronically stored information in digital and/or analog format, regardless of whether hard copies of the information exist. For the purpose of this letter, the phrase "electronically stored information" shall include all: (1) active data (i.e., data immediately and easily accessible on South Coast's systems today), (2) archived data (i.e., data residing on backup tapes or other storage media), (3) deleted data (i.e., data that has been deleted from a computer hard drive but is recoverable through computer forensic techniques), and (4) legacy data (i.e., data created on old or obsolete hardware or software) that pertains to the design, development, manufacture, assembly, modification, solicitation, or distribution of "Viewsat" branded equipment and/or any software technology designed or developed for download on such devices.

South Coast must retain and preserve all electronically stored information that pertains to the described allegations against Defendants, including but not limited to:

- word-processing files or documents (including drafts and revisions);
- spreadsheets (including drafts and revisions);
- databases;
- software or programs (including any "batch" and "bin" files);
- e-mails or other electronic communications (including any internal or external communications or attachments, whether sent or received);
- Internet and web-browser files (including preference, cache and "cookies" files);
- data documenting computer usage by South Coast;
- Computer-Aided Design (CAD) files (including drafts and revisions);
- presentation data or slide shows produced by presentation software (i.e., Microsoft PowerPoint);
- graphs, charts, and other data produced by project management software (e.g., Microsoft Project);
- animations, images, audio, video and audiovisual recordings, and voice mail files;

3

T. WADE WELCH & ASSOCIATES

- data generated by calendaring, task management and personal information management (PIM) software (e.g., Microsoft Outlook, Lotus Notes); and
- data created with the use of a personal data assistant (PDA) (e.g., PalmPilot, Blackberry).

## III.    Tangible Things

South Coast is obligated to preserve and retain all tangible things pertaining to the design, development, manufacture, assembly, modification, solicitation, or distribution of "Viewsat" branded equipment and/or any software technology designed or developed for download on such devices. For the purpose of this letter, the phrase "tangible things" includes, but is not limited to, all goods, wares, merchandise, and products relating to the information requested herein.

South Coast should preserve, without limitation, any of the following tangible things that pertain to the described allegations against Defendants:

- computer servers, personal computers, laptops, hard drives, PDAs, and other electronic processing devices;
- magnetic, optical or other storage and backup media (including backup tapes, floppy disks, CD-ROMs);
- "Viewsat" branded equipment, receivers, and/or components that have been downloaded, flashed, or otherwise modified to receive encrypted satellite television signals.

South Coast's compliance with the obligations to preserve potential evidence is critical to the litigation against Defendants. Therefore, South Coast should retain and implement all reasonable measures to preserve any documents, electronically stored information, and/or tangible things that may pertain to the design, development, manufacture, assembly, modification, solicitation, or distribution of "Viewsat" branded equipment and/or any software technology designed or developed for download on such devices. South Coast should also forward a copy of this letter to all persons or entities that are responsible for the care, custody, or control of the information referenced above. Thank you for your cooperation.

Sincerely,

Rick Olsen

4